## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JEROME DAVIS, ) | |
| 27 O Street NW, Apartment 219 ) | |
| Washington, D.C. 20001, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Case No.  1:15-cv-1497 |
| THE DISTRICT OF COLUMBIA ) | |
| 1350 Pennsylvania Avenue NW ) | |
| Washington, D.C. 20004, ) | Jury Trial Demanded |
| ) | |
| Officer Jerry Afari ) | |
| Metropolitan Police Department ) | |
| (Badge No. 4632), ) | |
| ) | |
| John Doe Officers 1–25, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

### Nature of the Action

1.      On the evening of Friday, October 10, 2014, 56-year-old Jerome Davis was at the Fresh Cut Barber Shop on 1518 North Capitol Street NW where he works.  While Mr. Davis was with a customer, a neighbor entered the barbershop and told Mr. Davis that a phalanx of heavily armed officers from the Metropolitan Police Department ("MPD") had kicked Mr. Davis's door of its hinges, stormed into his apartment, and ransacked the entire place.

2.      Mr. Davis, a disabled man who had recently been selected to move away from a neighborhood in which he felt unsafe and into a recently constructed mixed income apartment building, was not suspected of any wrongdoing, nor did the officers have any facts or evidence that any illegal activity had ever occurred in his home.

1

3.      Instead, the officers sought to enter his home and look through all of his most intimate possessions because—at an unspecified earlier date—another man named Steve Williams had been stopped and arrested for possession of 4.1 grams of drugs and given Mr. Davis's address as his own. Based on their "training" and "experience" concerning the habits of "persons involved in illegal activities," MPD officers asserted in a sworn search warrant application that they believed they would find illegal activity in Mr. Davis's home.

4.      Steve Williams is in no way related to Mr. Davis—the two were former acquaintances.  Not a single fact connected Steve Williams's possession of 4.1 grams of drugs (at an unknown date in the past) to Mr. Davis's home.

5.      In cases such as this one, where MPD officers seek a search warrant without particularized facts and based only on their claimed "knowledge," "training," and "experience," searches rarely produce evidence of the illegal activity that police allegedly seek.  For example, MPD officers regularly make similar assertions based on their "training" and "experience" that they will discover documents or records of drug distribution.  Yet, in the years leading up to the raid of Mr. Davis's home MPD officers failed to locate such documents or other records in over 99% of such street-stop "training" and "experience"-based raids.

6.      Nothing illegal was found at Mr. Davis's home.  For reasons unknown to Mr. Davis, the Defendants seized his computer and searched it before giving it back to him on another occasion, a fact omitted from the search warrant return filed with the Superior Court.

7.      What happened to Mr. Davis raises serious issues of systemic misconduct and recklessness of the MPD in obtaining and executing search warrants in the District of Columbia.[1]

---

[1] The allegations in this Complaint are based on personal knowledge as to matters in which the Plaintiff has had personal involvement and information and belief as to all other matters.

## Nature of the Action

8.      Plaintiff seeks compensatory relief for the violations of his constitutional rights by the District of Columbia and the Defendant Officers in their individual capacities.

## Jurisdiction and Venue

9.      This is a civil rights action arising under 42 U.S.C. § 1983 and the Fourth and Fifth Amendments to the United States Constitution. This Court has jurisdiction pursuant 28 U.S.C. §§ 1331 and 1343.

10.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## Parties

11.     Plaintiff Jerome Davis is a 56-year-old resident of the District of Columbia.

12.     The District of Columbia is the municipal entity that operates the Metropolitan Police Department and that trains and supervises the Defendant officers.

13.     Defendant Officer Jerry Afari prepared and swore under oath the search warrant and participated in the planning and execution of the raid of Mr. Davis's home.

14.     John Doe Officers 1–25 are the Metropolitan Police officers who participated in the planning and execution of the raid of Mr. Davis's home.  Defendants Afari and the District of Columbia are in possession of the full names and badge numbers of Defendant John Doe officers, and their full identities can easily be discovered.  All of the Defendant officers are sued in their individual capacities.

## Factual Background

### The Clear Lack of Probable Cause

15.     The warrant application made by Defendant Afari to raid Mr. Davis's home plainly lacked probable cause.  *See generally* Exhibit 1 (Sworn Application made by Officer

Afari).  No reasonable officer could have believed that it established probable cause to search Mr. Davis's residence.

16.     The basis of the warrant was an investigation into the alleged activities of Steven Williams, a former acquaintance of Mr. Davis. The warrant application does not include a single particularized fact that would link Mr. Davis's residence to any of the suspected criminal activity on the part of Mr. Williams.

17.     The warrant application describes an incident—the date of which Defendant Afari never even provided—in which Mr. Williams was arrested on suspicion of drug possession.  The warrant alleges that Mr. Williams was in possession of drugs even though the substances were never field-tested. Moreover, the warrant application does not provide any particular information from which a reasonable officer could infer that evidence would be found at *Mr. Williams's* home, let alone *Mr. Davis's* home, who is only a former acquaintance of Mr. Williams.

18.      Lacking any actual facts connecting Mr. Davis's home to any criminal activity, Defendant Afari asserted in his warrant application that based on his "training" and "experience" in drug investigations, individuals who "deal in illegal controlled substances" maintain documents, letters, and records of illegal activity, which are "usually secreted in their residences, or the residences of friends, family members . . . or in in the places of drug distribution activity, such as a stash house or a safe house."  Defendant Afari does not draw any particularized distinctions within the class of people who "deal in illegal controlled substances." Defendant Afari's sweeping generalizations about a large and diverse set of individuals is woefully insufficient grounds for a search warrant of a residence that is unrelated to the alleged criminal activity.

19.     Defendant Afari's assertion that police were likely to find photos of the suspects

themselves or associates engaging in illegal activity based on his "training" and "experience" was knowingly and recklessly false.  Defendant Afari omitted to tell the Superior Court judge that, in executing similar search warrants based solely on statements of "training" and "experience" about "people who deal in illegal controlled substance," MPD officers rarely find such items and that, based on information collected and produced by the MPD, it was overwhelmingly likely that the Defendants would *not* find the items listed.

20.     The only tenuous link that Defendant Afari provides between the alleged drug possession of Mr. Williams and Mr. Davis's home is "a check of the MPD JUSTIS database" which had listed Mr. Williams's address as the address at which Mr. Davis's resides and a check with pre-trial services, which yielded the same result.  Blind reliance on the JUSTIS database and pre-trial services was knowingly reckless and insufficient to establish a legitimate link between the alleged criminal activity and Mr. Davis's apartment.

21.     Mr. Williams had no significant connection to Mr. Davis's residence. Although the two used to be acquaintances, Mr. Williams never spent even one night at Mr. Davis's home.

22.     Defendant Afari and the other MPD defendant officers failed to take obvious steps that would have verified that Mr. Williams had no connection to Mr. Davis's home.  For example, the Defendants could have checked with the property manager to determine whether Mr. Williams had ever entered Mr. Davis's apartment.

23.     Defendant Afari and the other Defendants knew about the possibility of checking with the property manager but maliciously or negligently failed to take those steps.  Instead, Defendant Afari and the other Defendants checked with the property manager *after* raiding Mr. Davis's home.  The check with the property manager provided videotape evidence confirming that Mr. Williams had no connection to the residence.  Any reasonable officer would have taken

this step prior to raiding the home of a completely innocent person.

24.     Pursuant to MPD policy and practice, Defendant Afari and the other MPD defendant officers seized Mr. Davis's computer and did not list this seizure in the inventory section of the warrant.

25.     Defendant Afari provides no particular facts to identify the computer(s) that would belong to Mr. Williams or provide reasonable evidence that there would be information related to the alleged criminal activity stored on the computer.  Nor did Defendant Afari request or secure protocols required for the particularized search of Mr. Davis's electronic device, even were such a search supported by any evidence.

26.     Personal computers can contain the most personal, private, and intimate details of a person or family's life.

27.     Defendant Afari had never been to Mr. Davis's home and had no evidence connecting the home to the criminal activity, other than the listed addresses for Mr. Williams, a man who had never spent a single night at Mr. Davis's apartment.

28.     Defendant Afari did not even know whether Mr. Williams owned a computer or a smart phone, much less that those devices contained evidence of his involvement in any criminal activity.  Defendant Afari did not know that any electronic equipment (computer, smart phone, digital camera, etc.) confiscated from Mr. Davis's home was likely to have been used by Mr. Williams, much less contain evidence of his involvement in any criminal activity.

29.     Many District residents do not have landline telephones, and therefore use computers or cell phones to communicate with family and friends. The seizure of Mr. Davis's computer is a significant infringement into his daily activity given that managing one's daily life often involves access to files on a personal computer and internet access.

30.     The warrant application does not specify the date of the alleged actions that gave rise to the search warrant.  The only dates provided in the warrant application are in reference to the work that the confidential informant had been doing for MPD.  The warrant application *only* states that the confidential informant has been providing information to the Fifth District Vice Unit since 2007 and to Officer Kentish since July 2014.

31.     These dates do not determine the timeline of events surrounding Mr. Williams's arrest and subsequent search of Mr. Davis's home.  Mr. Williams could have been arrested at any date between 2007 and the search of Mr. Davis's home.  Nothing in the warrant application provides a temporal link between these two events.  Thus, in addition to lacking entirely in probable cause, the warrant was obviously stale.

32.     There is nothing in the warrant application that states that Mr. Williams's arrest was based on information provided to Officer Kentish.

33.     Without providing dates for Mr. Williams's arrest, there is no reasonable foundation for searching any location, much less Mr. Davis's home, which was unconnected to any allegations against Mr. Williams. The facts giving rise to the search warrant must have a temporal nexus to the search itself.  An event that potentially happened years in the past cannot be adequate justification for any search.  Without these dates, the warrant stands woefully short of providing probable cause.

34.     The MPD's training scheme and policies teach officers that any District resident, by virtue of having an alleged drug possessor among her acquaintances, has unknowingly subjected all of her life's possessions to a violent search by government agents.

35.     By claiming that evidence of a crime might be found in the homes of the criminal, "or" the homes of friends, "or" the homes of family, "or" the homes of associates, "or" in other

Case 1:15-cv-01497-JEB   Document 1   Filed 09/15/15   Page 8 of 13

locations, such as "stash houses," the warrant's statements of training and experience themselves removed on the warrant's face any particularized probable cause to believe that the specific items sought would be located at Mr. Davis's apartment.

36.     The MPD scheme of relying on the "training" and "experience" of officers thus purportedly give agents of the District's government the ability to raid and search multiple homes and other locations for every traffic stop or street arrest in which they find contraband.

**The Warrant Relied on False and Misleading Statements and Omissions**

37.     In addition to the warrant application's facial invalidity, the warrant's appeals to "training" and "experience" were also false and misleading.

38.     Defendant Afari omitted to tell the Superior Court Judge that, in the vast majority of cases in which MPD officers execute search warrants after a traffic or street stop based only on their "training" and "experience" and not actual evidence connecting the home to criminal activity, the warrant returns submitted by officers themselves prove that MPD officers *do not* find the items that they seek.

39.     For example, examining all of the "training" and "experience"-based warrants in the year preceding the invasion of Mr. Davis's home in which MPD officers sought to search a home based solely on assertions that a drug criminal would keep drugs at home, MPD officers failed to find any drugs, let alone the drugs they were looking for, in almost 66% of the cases.

40.     The statistics are even worse considering that the large majority of home drug raids found not what MPD officers claimed they would find, but turned up only small amounts of marijuana.  If small amounts of marijuana are excluded, MPD officers failed to find illegal drugs that they were purportedly searching for in nearly 87% of cases.

41.     According to the Department of Health and Human Services, the rate of illegal

drug usage by D.C. residents age 12 and older is 13.6%, including 11.2% for marijuana usage alone.

42.    Considering the significant usage rate of illicit drugs in all areas and across all demographics of the District, the MPD's success rate in "training" and "experienced"-based home raids (i.e., raids seeking to search a home without any particularized facts linking the home to criminal activity) is closer to what one would expect to find at random in searches of homes occupied by D.C. families.

43.    The statements of "training" and "experience" to the Superior Court judge thus knowingly and recklessly omitted from the judge the poor success rate of such warrants.  It is the duty of police officers swearing the warrant to inform the judge that the claims being made are not true and not substantiated by information collected by the MPD officers themselves.

44.    Statements under oath to a judge about what drug dealers "usually" or "commonly" or "habitually" do are especially misleading when MPD officers possess information that contradicts those vague statements of "experience."  For example, the actual training and experience of MPD officers teaches them that different levels and types of drug possessors and dealers have wildly different habits, and that the habits suggested by Defendant Afari do not apply to low-level possessors and dealers.  By failing to distinguish the differences in his training and experience, Defendant Afari deliberately misled the issuing judge.  Moreover, MPD officers also know through their training and experience that sophisticated drug dealers do not provide law enforcement with the location and address of the locations where they keep their stashes and evidence of their crimes.[2]  By depriving the issuing judge of a full or accurate

---

[2] Defendant Afari also failed to inform the issuing judge that people whom the MPD arrests for low-level drug offenses often stay at multiple residences and are otherwise transient. Other police officers have, when it serves their interests, sworn to this fact in other warrant applications

picture, Defendant Afari denied the neutral arbiter the ability to make a properly informed probable cause determination.

45.     The same applies to the other statements of training and experience claiming the likelihood of finding other various pieces of evidence, such as "books," "receipts," "notes," "ledgers," "photographs," and numerous other pieces of evidence.  Defendant Afari failed to inform the issuing judge that MPD officers fail to find such evidence in 99% of such warrant raids.  Defendant Afari falsely included these statements, however, in an attempt to gain putative permission to search through every piece of paper and every piece of electronics in the home, something he could not have gotten if his search was limited to small amounts of drugs.

**The Violent Invasion of Mr. Davis's Home**

46.     The police knocked Mr. Davis's door clean off the hinges when they burst through it.

47.     Mr. Davis had to spend a week without a front door during which time he did not feel secure in his own home.

48.     Mr. Davis propped the door up against the frame and piled his other belongings— that had been scattered by the police's reckless searching—behind it so any potential intruder might stumble and wake up Mr. Davis.

49.     Mr. Davis had recently relocated from the Southeast quadrant of Washington because he didn't feel safe in that neighborhood, only to suffer through feelings of trauma and insecurity after the police stormed into his new home unexpectedly and left his apartment both in ruins and without a door for security.

---

to different judges. Moreover, it is also common MPD experience that many people, especially low-income people without stable finances or those with many family members in different locations, will "stay" at multiple residences. *See, e.g.*, 2013-CRW-1369 ("It is not uncommon for individuals to live between places.").

50.     The Defendant Officers recklessly destroyed Mr. Davis's mattress by shredding it unnecessarily.

51.     Mr. Davis has been sleeping on his couch since the raid because he cannot afford to replace his mattress.

52.      The Defendant Officers split Mr. Davis's boxes of frozen food and emptied them into the sink, causing him to lose many meals' worth of hard-earned food.

53.     In order to save money, Mr. Davis often buys food in bulk, and the police ruined a week's worth of meat along with other food that Mr. Davis stored in his apartment.

54.     The Defendant Officers shredded his Lay-Z-Boy armchair, which he had purchased with money saved from working two jobs.

55.     Mr. Davis sat in his armchair every day and used it for entertainment during the football and basketball seasons.

56.     The Defendant Officers seized Mr. Davis's computer illegally and without listing it on the finalized version of the search warrant.

### Claims for Relief

**One: The Warrant Application Was so Lacking in Probable Cause that No Reasonable Officer Could Have Relied on It in Good Faith.   Reliance on the Warrant Application Violated the Fourth Amendment.**

57.     Plaintiff incorporates by reference the allegations in paragraphs 1–56 above.

58.     The Defendants obtaining, planning, and executing the search warrant for the Plaintiff's home relied on a warrant application that was so plainly lacking in probable cause that no reasonable officer could have relied upon it in good faith.   The warrant application utterly failed to provide any particularized facts linking the home to any criminal activity, let alone establish probable cause that the list of specific items sought would be found.   It also failed to

specify the date of the criminal act on which it was supposedly predicated.

**Two: The Warrant Application Contained Statements That Were Knowingly and Recklessly False and Made Material Omissions in Violation of the Fourth Amendment.**

59.    Plaintiff incorporates by reference the allegations in paragraphs 1–58 above.

60.    The warrant application presented to the Superior Court judge contained numerous statements of "training," "experience," and "knowledge," as well as statements concerning the basis of Defendant Afari's knowledge and experience, that were knowingly and recklessly false and misleading.  The warrant application also omitted material facts known to the MPD officer seeking the warrant that, if presented, would have undermined the asserted basis for seeking the warrant.  The Fourth Amendment prohibits obtaining a warrant on the basis of knowingly and recklessly false and misleading material assertions as well as the knowing and reckless omission of material information that would undermine a probable cause finding.

**Three: The Obvious Lack of Probable Cause and False and Reckless Statements and Omissions Were the Result of a Policy, Pattern, and Custom of Such Conduct by the MPD and the Result of the MPD's Failure to Properly Train and Supervise Its Officers.**

61.    Plaintiff incorporates by reference the allegations in paragraphs 1–60 above.

62.    The MPD has established a pattern, policy, and practice of training its officers to include in search warrant applications statements of "training" and "experience" that are unsubstantiated, vague, self-defeating, contradictory, woefully insufficient to substitute for actual evidence, materially false, and recklessly misleading in the ways described in this Complaint.  The MPD has established a pattern, policy, and practice of training its officers to use such statements of "training" and "experience" about the habits of "individuals who deal in illegal controlled substances" that officers stop on the street as a purported substitute for any actual evidence or police investigation into any evidentiary link to a particular residence.  Despite having actual knowledge of the factual and legal flaws in these statements, the MPD continues to

instruct its officers to predicate search warrant raids on such "training" and "experience"-based statements. The MPD has failed to properly train and supervise its officers on the Fourth Amendment standards for obtaining highly intrusive home search warrants.

**Four: Officers Raiding the Home Exceeded the Scope of the Warrant, Made Unnecessary and Unreasonable Seizures Not Authorized By the Warrant, and Deprived Mr. Davis of Property Without Due Process of Law in Violation of the Fourth and Fifth Amendments.**

63.     The Plaintiffs incorporate by reference the allegations in paragraphs 1–62 above.

64.     The MPD officers raiding the home unlawfully searched the home and destroyed many of Mr. Davis's most valuable possessions without cause. The Defendant Officers invaded the privacy of Mr. Davis by seizing a laptop containing the most intimate details of his life without any cause or specific authorization in the search warrant. The unlawful and unjustified search and seizures violate the Fourth Amendment.

## Request for Relief

WHEREFORE, Plaintiffs request that this Court issue a judgment against the Defendants:

a)  Holding the appropriate Defendants liable to the Plaintiffs for compensatory damages in the amount appropriate to the proof adduced at trial;
b)  Holding the appropriate Defendants (other than the District of Columbia) liable to the Plaintiffs for punitive damages in an amount appropriate to the proof adduced at trial;
c)  Awarding to the Plaintiffs their costs and reasonable attorney's fees; and
d)  Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Alec Karakatsanis*
Alec Karakatsanis (D.C. Bar No. 999294)
Phil Telfeyan (D.C. Bar Application Pending)
Equal Justice Under Law
916 G Street, NW #701
Washington, D.C. 20001
(202) 681-2409
*Attorneys for Plaintiffs*

Date: September 15, 2015