**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JEROME DAVIS,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.  15-1497 (JEB)** |
| **DISTRICT OF COLUMBIA,** *et al.*, | |
| **Defendants.** | |

**MEMORANDUM OPINION**

It is not surprising that when certain drug dealers are arrested on the street, police officers may seek search warrants for their homes in order to locate additional evidence or contraband. In an unfortunate twist here, Metropolitan Police Department officers obtained a warrant for the home of Plaintiff Jerome Davis after an arrestee misleadingly provided Davis's address instead of his own.  The officers then allegedly ransacked Davis's apartment in a fruitless search.

Yet this suit does not predominantly take aim at the geographic snafu; instead, it targets bigger game.  Plaintiff here challenges MPD's general practice of seeking search warrants for drug suspects' homes that are based solely on the officer's "training and experience."  Davis alleges that <u>actual</u> experience, purportedly backed up by data, demonstrates that neither drugs nor evidence is typically found in such a search.  As a result, this action claims that the warrant affidavit was false, thereby rendering any ensuing search a violation of the Fourth Amendment; that such affidavits constitute a pattern and practice of MPD, thus making the District of Columbia also liable; and that the execution of the warrant itself was unreasonable and excessive in scope.

Defendants have now moved to dismiss.  Finding that Plaintiff has alleged facts sufficient to establish Fourth Amendment violations, the Court will allow the lion's share of this suit to proceed.

## I.      Background

According to the Complaint, which the Court must presume true at this stage, this case arises from the October 10, 2014, search of Plaintiff's District of Columbia home pursuant to a warrant obtained by MPD officer Jerry Afari.  See Compl., ¶ 1.  The officers, however, were looking in the wrong place.  It turns out that Steve Williams, another man who was arrested on the street for possession with intent to distribute heroin, had given Davis's address as his own. Id., ¶ 3.  MPD officers then checked this purported address in their "JUSTIS database" and with the Pretrial Services Agency, both of which confirmed that the address Williams had provided was indeed where he lived.  Id., ¶ 20.  In actuality, Plaintiff maintains, "Williams had no significant connection to Mr. Davis's residence," and though the two men "used to be acquaintances," Williams "never spent even one night at Mr. Davis's home."  Id., ¶ 21.

In his warrant application, Afari averred that, based on his "training" and "experience," persons who "deal in illegal controlled substances" maintain evidence of illegal activity "usually secreted in their residences, or the residences of friends, [and] family members," or in "places of drug distribution activity, such as a stash house or a safe house."  Id., ¶ 18.  On the basis of this knowledge, he requested permission to search what he thought was Williams's home for, *inter alia*, "narcotics, illegal drugs, packaging, and proceeds of drug sale[s]."  Id., Exh. 1 (Warrant Application) at 4.  District of Columbia Superior Court Judge John Bayly approved the warrant. See id. at 1.

In Plaintiff's account, Davis was at work at Fresh Cut Barber Shop when "a phalanx of heavily armed officers . . . kicked [his] door of [*sic*] its hinges, stormed into his apartment, and ransacked the entire place." Id., ¶ 1. Although they found "[n]othing illegal" in Davis's home, MPD officers "ruined a week's worth of meat along with other food that Mr. Davis stored in his apartment," "shredded" his Lay-Z-Boy armchair and his mattress, and seized Davis's computer. Id., ¶¶ 50-56. (The officers subsequently returned the computer "on another occasion." Id., ¶ 6.) After the search, the officers contacted the property manager at Davis's address, who "provided videotape evidence confirming that Mr. Williams had no connection to the residence." Id., ¶ 23.

At the heart of Plaintiff's Complaint is his allegation that the "sweeping generalizations about a large and diverse set of individuals" that Afari presented in his warrant application as gleaned from his "training" and "experience" provided "woefully insufficient grounds" for approval of such a warrant. Id., ¶ 18. Davis alleges that "in the vast majority of cases in which MPD officers execute search warrants after a traffic or street stop based only on their 'training' and 'experience' and not actual evidence connecting the home to criminal activity, the warrant returns submitted by the officers themselves prove that MPD officers do not find the items that they seek." Id., ¶ 38. More specifically, he submits that in the year preceding the search at issue here, MPD officers "failed to find any drugs, let alone the drugs they were looking for, in almost 66% of the cases" in which they executed training-and-experience search warrants. Id., ¶ 39. And "[i]f small amounts of marijuana are excluded, MPD officers failed to find illegal drugs that they were purportedly searching for in nearly 87% of cases" involving training-and-experience warrants. Id., ¶ 40. In Davis's view, these dismal statistics reveal that Afari and his fellow officers "know through their training and experience that sophisticated drug dealers do not provide law enforcement with the location and address . . . where they keep their stashes and

evidence of their crimes." <u>Id.</u>, ¶ 44.  He further believes that Afari "knowingly and recklessly omitted from [his application] the poor success rate of such warrants" and thereby "deliberately misle[]d the issuing judge."  <u>Id.</u>, ¶¶ 43-44.

Plaintiff brings this 42 U.S.C. § 1983 suit against Afari and the 25 unnamed MPD officers who executed the search – all in their individual capacities – and against the District.  As recompense for their Fourth Amendment violations, Davis seeks general damages from all Defendants, as well as punitive damages from the individual officers.  <u>Id.</u> at 13.  Defendants now move to dismiss all of Plaintiff's claims.

## II.     Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a claim upon which relief can be granted."  In evaluating Defendants' Motion to Dismiss, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  <u>Sparrow v. United Air Lines, Inc.</u>, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting <u>Schuler v. United States</u>, 617 F.2d 605, 608 (D.C. Cir. 1979)) (citation omitted); <u>see also</u> <u>Jerome Stevens Pharms., Inc. v. FDA</u>, 402 F.3d 1249, 1250 (D.C. Cir. 2005).  The notice-pleading rules are "not meant to impose a great burden upon a plaintiff," <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S. 336, 347 (2005), and she must thus be given every favorable inference that may be drawn from the allegations of fact.  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 584 (2007).

Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, <u>id.</u> at 555, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 570).  Plaintiff must put forth "factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

Id.  The Court need not accept as true "a legal conclusion couched as a factual allegation," nor an

inference unsupported by the facts set forth in the Complaint.  Trudeau v. Fed. Trade Comm'n,

456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)

(internal quotation marks omitted)).  For a plaintiff to survive a 12(b)(6) motion even if

"recovery is very remote and unlikely," moreover, the facts alleged in the complaint "must be

enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555-56

(citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

In evaluating the sufficiency of Plaintiff's Complaint under Rule 12(b)(6), the Court may

consider "the facts alleged in the complaint, any documents either attached to or incorporated in

the complaint[,] and matters of which [the court] may take judicial notice."  Equal Emp't

Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

The Court may thus consider those materials on a motion to dismiss without treating the motion

"as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d); see also Marshall v.

Honeywell Tech. Solutions, Inc., 536 F. Supp. 2d 59, 65 (D.D.C. 2008).

**III.    Analysis**

Davis's Complaint includes four counts.  They allege that: (I) Afari's warrant application

was so lacking in probable cause that no reasonable officer could have relied on it in good faith,

meaning that the officers' execution of the warrant violated the Fourth Amendment; (II) Afari

made knowingly and recklessly false statements and omitted material facts from his warrant

application, in violation of the Fourth Amendment; (III) the deficiencies in the application were

part of a pattern or practice of similar behavior by MPD, thus rendering the District liable; and

(IV) the search of Davis's home exceeded the scope of the warrant and resulted in unreasonable

seizures and destruction of his property, in violation of the Fourth and Fifth Amendments.  Id., ¶¶ 57-64.  For ease of analysis, the Court will address Count II first, as it concerns events that precede those in Count I.  It then separately examines Counts III and IV.

A.  Count II: Warrant Application

Count II alleges that Defendants secured the warrant to search Davis's home via an application riddled with false statements and material omissions.  See Compl., ¶¶ 59-60.  The Supreme Court has explained that an expectation of truthfulness attends all warrant applications:

> When the Fourth Amendment demands a factual showing sufficient to comprise "probable cause," the obvious assumption is that there will be a truthful showing.  This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily.  But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.

Franks v. Delaware, 438 U.S. 154, 164-65 (1978) (internal quotation marks and citation omitted).  Given this expectation, the Fourth Amendment is violated where "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, [] if the allegedly false statement is necessary to the finding of probable cause."  Id. at 155-56.  Judicial approval of the warrant does not exonerate the affiant because the judicial officer would typically have no reason to suspect the falsehoods.

The relevant affiant here is Afari.  Plaintiff alleges that his warrant application "contained numerous statements" of his "'training,' 'experience,' and 'knowledge' . . . that were knowingly and recklessly false and misleading . . . [and] also omitted facts known to [him] that, if presented, would have undermined the asserted basis for seeking the warrant."  Compl., ¶ 60.  Specifically, Plaintiff asserts that "Afari omitted to tell the Superior Court Judge that, in the vast majority of

cases in which MPD officers execute search warrants after a traffic or street stop based only on

their 'training' and 'experience' and not actual evidence connecting the home to criminal

activity, the warrant returns submitted by officers themselves prove that MPD officers <u>do not</u>

find the items that they seek." <u>Id.</u>, ¶ 38.  (The Court assumes, for purposes of the Motion,

although Plaintiff does not specify, that the underlying arrests in this sample were for drug

distribution or for possession with intent to distribute, rather than simple possession.)  Davis

states, furthermore, that in the year preceding the search of his home, MPD officers failed to find

<u>any</u> drugs in 66% of these training-and-experience-only searches and "failed to find illegal drugs

that they were purportedly searching for in nearly 87% of cases." <u>Id.</u>, ¶¶ 39-40.  Plaintiff insists

that Afari knew about "the poor success rate of such warrants," <u>id.</u>, ¶ 43, and misled Judge Bayly

by withholding that knowledge or offering statements contrary to it. <u>Id.</u>, ¶ 44.

In moving to dismiss, Afari responds that these statistics are "irrelevant," both because an

affidavit "need not present all the relevant information known to the police at the time" and

because "only a probability" of criminal conduct is required.  <u>See</u> MTD at 9 (quoting <u>Illinois v.

Gates</u>, 462 U.S. 213, 235, 239 (1983)).  The first point is not compelling where Plaintiff's

argument is that Afari concealed evidence that directly undermined probable cause.  As to the

second, the Court acknowledges that "[t]he test for probable cause is not reducible to precise

definition or quantification." <u>Florida v. Harris</u>, 133 S. Ct. 1050, 1055 (2013) (internal quotation

marks and citation omitted).  At the same time, courts "have required . . . the kind of fair

probability on which reasonable and prudent people . . . act." <u>Id.</u> (internal quotation marks and

citation omitted).  So while probable cause is "a fluid concept," encompassing the totality of the

circumstances rather than rigid rules or bright lines, it "turn[s] on the assessment of probabilities

in particular factual contexts." <u>Gates</u>, 462 U.S. at 232.

While the D.C. Circuit two decades ago sanctioned training-and-experience warrants for the search of suspected drug dealers' homes on the ground that there was probable cause to believe that contraband or evidence may be found there, see United States v. Thomas, 989 F.2d 1252, 1255 (D.C. Cir. 1993), that does not end the analysis. This is because Plaintiff has alleged (with some statistical support) that Afari's experience and training are to the contrary. If Davis is correct, then Afari's statements would have been false or at least misleading. While the Court agrees that there is no fixed percentage of likelihood of discovering contraband, below which a judge must deem probable cause to be lacking, it does not concur that the success rate of this type of training-and-experience warrant is wholly irrelevant to a probable-cause determination. In fact, because those success rates may undermine the key inference on which the warrant here rests, they could be critical in this case. See Massachusetts v. Upton, 466 U.S. 727, 734 (1984) (probable cause requires something "stronger than a mere uninformed and unconfirmed guess," though "[i]t is enough that the inference" on which it is based "was a reasonable one and conformed with the other pieces of evidence making up the total showing of probable cause); Gates, 462 U.S. at 239 ("A sworn statement of an affiant that he has cause to suspect and does believe that [contraband or evidence] is located on certain premises will not do. . . . Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others.") (internal quotation marks and citation omitted).

A talismanic invocation of his "training and experience" will not inoculate an affiant's statement against the basic scrutiny that normally attends claims of probable cause in warrant applications. Taking the Complaint's allegations as true, as required at this posture, the Court

concludes that Plaintiff has stated a claim that Afari secured the warrant to search Davis's home with material false statements or omissions, thereby violating the Fourth Amendment.

By contrast, the Court will dismiss Count II against the twenty-five unnamed MPD officers. Nowhere does Plaintiff assert that any of them – or, for that matter, any officer other than Afari – played any role in the creation and submission of the warrant application. The Complaint, in fact, proclaims that "Afari prepared and swore under oath the search warrant" and that "John Doe Officers 1-25" only "participated in the planning and execution of the raid of Mr. Davis's home." Compl., ¶¶ 13-14. Absent any allegations tying these officers to Afari's affidavit, Count II cannot move forward against them.

Finally, the Court would be remiss not to note that Plaintiff still faces an uphill climb with regard to what remains of this count. First, Davis will need to prove that deleting the purportedly false information would have vitiated probable cause. For there is no Fourth Amendment violation if, "when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause." Franks, 438 U.S. at 171-72. Second, he must establish that Afari's affidavit "was the product 'of deliberate falsehood or of reckless disregard for the truth.'" Washington v. District of Columbia, 685 F. Supp. 264, 272 (D.D.C. 1988) (quoting Franks, 438 U.S. at 171). To satisfy this standard, Plaintiff will need to demonstrate that Afari's experience was contrary to what he averred and that he was not so trained. That may be no simple task.

B.    Count I: Reliance on Warrant

Count I contends that the warrant itself, once signed by the judge, was so lacking in probable cause that no reasonable officer could have relied on it, thereby rendering Defendants' execution of it a violation of the Fourth Amendment. Of course, "[i]t is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted."

Groh v. Ramirez, 540 U.S. 551, 563 (2004).  At the same time, courts "have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and . . . that in such cases those officials – like other officials who act in ways they reasonably believe to be lawful – should not be held personally liable." Anderson v. Creighton, 483 U.S. 635, 641 (1987).  For this reason, "the protection of qualified immunity is available if 'a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officers possessed.'" Youngbey v. March, 676 F.3d 1114, 1117 (D.C. Cir. 2012) (quoting Wilson v. Layne, 526 U.S. 603, 615 (1999)).  The Court considers Afari separately from the other officers.

### 1. Afari

Here, Afari directly prepared the warrant application and accompanying affidavit.  If, as Plaintiff maintains, his affidavit included knowingly false statements or material omissions, Afari cannot hide behind the judge's stamp of approval.  See Groh, 540 U.S. at 564 ("[B]ecause petitioner himself prepared the invalid warrant, he may not argue that he reasonably relied on the Magistrate's assurance that the warrant contained an adequate description of the things to be seized and was therefore valid.").  On these facts, consequently, the Court must conclude that it was not objectively reasonable for Afari to rely on the warrant in executing the search because of his knowledge of those misrepresentations or omissions.  As such, he is not entitled to qualified immunity, and Count I survives against him.

### 2. MPD Officers

The twenty-five unnamed MPD officers are in a different position altogether.  Unlike Afari, none of them participated in the preparation and submission of the warrant application.  They thus had no *ex ante* reason to distrust its contents.  The question, accordingly, is whether they could reasonably rely on the warrant once signed by the judge.

Typically, "[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment.  In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient."  United States v. Leon, 468 U.S. 897, 921 (1984).  "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost."  Malley v. Briggs, 475 U.S. 335, 344-45 (1986) (citing Leon, 468 U.S. at 923).  If a reasonable officer could have believed that the warrant application was valid, therefore, he is entitled to qualified immunity for executing the warrant – even if a court later deems it invalid.  See Elkins v. District of Columbia, 690 F.3d 554, 565 (D.C. Cir. 2012) (officer entitled to qualified immunity where "warrant not facially invalid").  Here, though the warrant authorizing the search of Davis's home was duly signed by a Superior Court judge, Plaintiff nonetheless maintains that the application "lacked probable cause on its face."  Opp. at 2.  The Court does not agree.

The D.C. Circuit has been clear that "observations of illegal activity occurring away from the suspect's residence[] can support a finding of probable cause to issue a search warrant for the residence, if there is a reasonable basis to infer from the nature of the illegal activity observed, that relevant evidence will be found in the residence."  Thomas, 989 F.2d at 1255.  In his affidavit supporting the warrant application, Afari averred that he is "responsible for investigating narcotics offenses," in which capacity he "ha[s] become familiar with the methods and techniques associated with the distribution of narcotics."  Warrant Application at 2.  Afari explained that at the time of Williams's arrest, he was found to be carrying "4.1 Grams" of heroin, and "[b]ased on Officers' experience and training, the amount and packaging [of the

drugs] that the defendant was in possession of, along with the amount of U.S. currency [$235] is more consistent with the possession with intent to distribute rather than mere possession." Id. at 5. [1]  He then stated that, based on his "training, experience[,] and extensive participation in narcotic and drug-related investigations," he

> knows that [i]ndividuals who deal in illegal controlled substances maintain books, records, receipts, . . . large quantities of currency, financial instruments, jewelry and other items of value, typically proceeds of illegal controlled substance transactions, . . . telephone number books or papers which reflect names, addresses and/or telephone numbers for their associates in their illegal organization . . . [,] photos of themselves, their associates, their property, and illegal contraband, . . . fictitious names, false identification, . . . cashier's checks and cellular phones relating to cash transactions . . . usually secreted in their residences, or the residences of friends, family members, or associates, or in the places of operation of the drug-distribution activity, such as a stash house or safe house.

Id. at 2-3.

These statements seem to be precisely the sort contemplated by Thomas and its progeny. For example, in United States v. Washington, 775 F.3d 405 (D.C. Cir. 2014), the court held that where "the affidavit points to general practices of drug traffickers" and the affiant-officer's observations, in "his extensive experience in drug enforcement, . . . that drug traffickers rarely keep on their person . . . their entire supply of drugs and instead commonly retain much or most of their drug supply in their home or stash house," the officer executing the warrant authorizing search of drug-trafficker's home "could certainly harbor Leon's 'objectively reasonable belief' that contraband or evidence would be found within."  Id. at 409 (internal quotation marks and

---

[1] The application in one instance actually misidentifies the drug in question as crack cocaine.  See Warrant Application at 5 (describing "the amount and packaging of the crack cocaine that the defendant was in possession of . . .") (emphasis added).  The Court assumes that this is a mistake, since Williams was charged only with "UCSA Possession of Other (Suboxane), and UCSA PWID Heroin," and the application's descriptions of the drugs found on his person – "yellow zips containing a tan powder substance" – do not sound like crack cocaine.  See id.  At the same time, though this may be nothing more than a mere scrivener's error, it does not bolster confidence in the veracity of the application.

citation omitted); <u>see also</u> <u>United States v. Spencer</u>, 530 F.3d 1003, 1007 (D.C. Cir. 2008)

("Common experience suggests that drug dealers must mix and measure the merchandise, protect

it from competitors, and conceal evidence of their trade—such as drugs, drug paraphernalia,

weapons, written records, and cash—in secure locations. For the vast majority of drug dealers,

the most convenient location to secure items is the home. After all, drug dealers don't tend to

work out of office buildings. And no training is required to reach this commonsense

conclusion."); <u>United States v. Johnson</u>, 437 F.3d 69, 72 (D.C. Cir. 2006) (affidavit to search one

of defendant's two residences was sufficient to establish probable cause where it relied on

testimony that, "in the affiant's experience, drug dealers frequently keep business records,

narcotics, proceeds from sales, and firearms in their houses") (internal quotation marks and

citation omitted).  This principle is well established in our Circuit – as well as in many others,

<u>see</u> <u>Thomas</u>, 989 F.2d at 1255 (collecting cases) – and Plaintiff's attempt to argue otherwise is

unavailing.

      This case does not involve, as Plaintiff seems to suggest, a mere "street arrest in which

[police] find contraband."  Compl., ¶ 36.  Rather, the warrant expressly states that Williams was

charged with "tampering with evident [*sic*], . . . Possession of Other (Suboxane), and . . . PWID

[Possession With Intent to Distribute] Heroin."  Warrant Application at 5.  The warrant

application thus establishes (1) an individual arrested on suspicion of drug trafficking; (2) an

address twice verified (via the JUSTIS database and PSA) as the suspect's residence; and (3)

sworn statements of a purportedly experienced officer (Afari) that drug traffickers tend to keep

evidence, contraband, and the like in their residences.  Another officer could thus justifiably rely

on it.

Plaintiff objects that the date of Williams's arrest is omitted from the application, thus vitiating its value. In other words, the officers executing the warrant had no idea whether Williams had been arrested two days or two years earlier. <u>See</u> Opp. at 9. That omission (and the judge's failure to catch it) are troubling, to be sure, but any fears an executing officer might have had that the probable cause was stale could have been assuaged by Afari, who had personal knowledge that the arrest did in fact occur two days prior to the application date. <u>See</u> MTD at 7-8. An officer could reasonably believe that Judge Bayly had been satisfied of this before signing the warrant. <u>Cf.</u> <u>United States v. Hopkins</u>, 128 F. Supp. 2d 1, 7 (D.D.C. 2000) (affidavit indicating only that suspects had been arrested twice at some time in the last fifteen months resulted in warrant that was stale on its face). At the end of the day, the application here was not so lacking in indicia of probable cause as to make the officers' reliance on it unreasonable.

As to the 25 unnamed MPD officers who executed the search warrant, then, the Court cannot conclude that their belief in the validity of the warrant was objectively unreasonable. And this is true regardless of the role they played. <u>Cf.</u> <u>Elkins</u>, 690 F.3d at 568-69 ("What's reasonable for a particular officer depends on his role in the search. . . . [A]lthough those who lead the team must read the warrant and assure themselves of its sufficiency, line officers . . . do not have to actually read or even see the warrant; they may accept the word of their superiors that they have a warrant and that it is valid. So long as they make inquiry as to the nature and scope of the warrant, their reliance on leaders' representations about it is reasonable.") (quotation marks removed) (citing <u>Ramirez v. Butte–Silver Bow Cnty.</u>, 298 F.3d 1022, 1027 (9th Cir. 2002), <u>aff'd sub nom.</u> <u>Groh v. Ramirez</u>, 540 U.S. 551 (2004)). As these unnamed officers are entitled to qualified immunity for their reliance on a facially valid search warrant, the Court will dismiss Count I as to them.

C.      Count III: Municipal Liability

Plaintiff's third count seeks to hold the District liable for a pattern or practice of obtaining search warrants through knowingly false statements or material omissions under the principles set forth in Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978) (holding that municipalities may be liable under § 1983 for a custom of constitutional violations). See Compl., ¶¶ 61-62. The count also alleges that this pattern of securing warrants without probable cause, based solely on training-and-experience statements, is the result of MPD's failure to properly train and supervise its officers in discharging their Fourth Amendment obligations.

On its face, Plaintiff's allegations are sufficient to make out a claim for municipal liability: Counts I and II state that Afari violated the Fourth Amendment, and Count III asserts that the MPD has a pattern or practice of similar violations. See Baker v. District of Columbia, 326 F.3d 1302, 1306 (D.C. Cir. 2003) ("[I]n considering whether a plaintiff has stated a claim for municipal liability, the district court must conduct a two-step inquiry. First, the court must determine whether the complaint states a claim for a predicate constitutional violation. Second, . . . the court must determine whether the complaint states a claim that a custom or policy of the municipality caused the violation.") (citing Collins v. City of Harked Heights, 503 U.S. 115, 120 (1992)). The District's only response, in moving to dismiss, is that Plaintiff has not alleged an underlying constitutional violation with respect to the validity of the warrant in this case. See MTD at 12-13. Because the Court has already concluded the contrary – i.e., the Complaint sufficiently alleges that Afari improperly obtained a warrant without probable cause – Defendant's argument does not persuade.

The District also asserts, unhelpfully, that "a single incident of alleged unconstitutional activity is not enough to impose liability on a municipality." Id. at 13. While this may be true,

Plaintiff's allegations clearly sweep more broadly than the one-time search of Davis's home. According to the Complaint, MPD officers routinely "execute search warrants after a traffic or street stop based only on their 'training' and 'experience' and not actual evidence connecting the home to criminal activity," and yet "do not find the items that they seek."  Compl., ¶ 38. Plaintiff's statistics about the success rates of such warrants were apparently compiled by examining a number of training-and-experience warrants, not merely the one underlying this case.  See id., ¶¶ 39-42.  Indeed, Plaintiff expressly explains that "[t]he MPD has established a pattern, policy, and practice of training its officers to include in search warrant applications statements of 'training' and 'experience' . . . about the habits of 'individuals who deal in illegal controlled substances' that officers stop on the street as a purported substitute for any actual evidence or police investigation into any evidentiary link to a particular residence[ d]espite having actual knowledge of the factual and legal flaws in these statements."  Id., ¶ 62.  These are more than "mere conclusory statements" that fail to "state a claim for relief that is probable on its face."  Iqbal, 556 U.S. at 678 (quotation marks and citation omitted).

     The Court points out, however, that establishing Monell liability will be no walk in the park, as some of the aforementioned statistics may prove less helpful to him than they initially appear.  For example, if the sample size of search warrants examined was not sufficiently large to produce a statistically significant result or if the statistics include arrests for drug possession as well as for possession with intent to distribute or distribution, their value could be substantially diminished.   "Training and experience" warrants, moreover, are not necessarily ineffective if they do not result in the recovery of drugs because other evidence – e.g., razor blades, packaging, digital scales, cutting agents – is often equally probative of a drug dealer's operation.  Statistics pertaining only to the discovery of drugs, therefore, may not entitle Plaintiff

to relief.  Ultimately, his success against the city will hinge on whether the trends Plaintiff's

Complaint alleges – in substantial part, through statistics – are borne out by the evidence he

produces.

       D.      <u>Count IV: Execution of Warrant</u>

      In his final count, Plaintiff alleges that all of the officers, including Afari, violated the

Fourth Amendment by exceeding the scope of the warrant when they "ransacked" his residence

and unlawfully seized his computer.  <u>See</u> Compl., ¶¶ 1, 63-64.  In response to the computer

allegation, the District points out that the warrant expressly included "computers" in its listing of

"property . . . being concealed," <u>see</u> Warrant Application at 1, and that "the search warrant was

valid."  MTD at 11.  As the Court has already determined that it was objectively reasonable for

the unnamed MPD officers to rely on the warrant in executing the search, <u>see</u> Section III.A,

*supra*, they could permissibly seize the computer.  As to Afari, if it was unreasonable for him to

rely on the warrant in executing the search, it was also unreasonable for him to rely on it in

seizing items.  The computer claim, consequently, survives against him.

      Davis's allegation that Defendants exceeded the scope of the warrant when they

"recklessly destroyed" his property – specifically, when they damaged his door, shredded

Plaintiff's mattress and armchair, and split boxes of food open – presents a closer question.  <u>See</u>

Compl.,¶ 50.  While the officers may have reasonably relied on the warrant, that alone does not

absolve them of any potential liability for the <u>manner</u> of its execution.  "The conduct of police

officers in executing a search warrant is always subject to judicial review as to its

reasonableness, and officers may be held liable under section 1983 for executing a warrant in an

unreasonable manner," though courts do "recognize that 'officers executing search warrants on

occasion must damage property in order to perform their duty.'"  <u>Tarpley v. Greene</u>, 684 F.2d 1,

8-9 (D.C. Cir. 1982) (quoting <u>Dalia v. United States</u>, 441 U.S. 238, 258 (1979)).  "Whether a

search is unreasonable . . . must be determined by the particular facts of the case, including the scope of the search authorized by the warrant. . . . [D]estruction of property that is not reasonably necessary to effectively execute a search warrant may violate the Fourth Amendment." Id. at 9.

The warrant here authorized the officers to search for "a variety of materials, including items that are easily hidden such as drugs," as well as records of and proceeds from illegal drug transactions. See MTD at 12. Defendants assert that an officer could reasonably believe that these items were hidden away in a mattress or armchair, while Plaintiff rejoins that the search of his armchair, mattress, and food was "unnecessary." Opp. at 32. Taking the Complaint at its word, as the Court must, Davis has the stronger position. For even if the search for these small "secreted" items, see Warrant Application at 1, necessitated some damage to property, the Court cannot conclude that the officers acted reasonably when they shredded the armchair and mattress and "split Mr. Davis's boxes of frozen food and emptied them," absent any indication that contraband or evidence would be found therein. See Compl., ¶¶ 50-55. Such extreme and destructive tactics are hardly the norm for searches of drug-traffickers' homes. Cf. United States v. Geraldo, 271 F.3d 1112, 1117 (D.C. Cir. 2001) ("[A]gents found a razorblade with cocaine residue hidden between the mattress and boxsprings of the bed.") (emphasis added); Robinson v. Pezzat, 83 F. Supp. 3d 258, 268 (D.D.C. 2015) (Where "[a] broadly-worded warrant authorized defendants to search plaintiff's residence for concealed drugs[,] . . . the defendant officers had every reason, indeed, every right, to search in closets, beneath sofas, and behind picture frames for concealed drugs").

While "[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search," United States v. Ross, 456 U.S. 798,

820-21 (1982), the Court does not believe that the "opening" of an item not traditionally opened – which also renders that item completely unusable in the future – shares the same presumption of reasonableness.  Although neither party raises the issue here, it may be helpful at summary judgment also to consider the question of proportionality – *i.e.*, whether the scope of a search depends at all on the seriousness of the underlying crime.  In any event, Plaintiff has stated a claim that the MPD officers' search unreasonably exceeded the scope of the warrant, in contravention of the Fourth Amendment.  Count IV thus survives.

## IV.      Conclusion

For the foregoing reasons, the Court will grant in part and deny in part Defendants' Motion to Dismiss.  The following Counts will remain: Counts I and II as to Afari, Count III as to the District, and Count IV as to both Afari and the 25 unnamed MPD officers.  An Order to that effect will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: January 15, 2016